STATE OF NEBRASKA, APPELLEE, v. BARBARA JEAN GLOUSER, APPELLANT.

226 N. W. 2d 328

Filed February 27, 1975. No. 39441.

Bernard Walsh, Jr., and William R. Kurtz, for appellant.

Clarence A. H. Meyer, Attorney General, and Michael R. Johnson, for appellee.

Heard before WHITE, C. J., SPENCER, BOSLAUGH, McCOWN, NEWTON, CLINTON, and BRODKEY, JJ.

SPENCER, J.

Defendant appeals her conviction for possession of a controlled substance with intent to deliver. Defendant alleges 13 assignments of error. Essentially there are only three: (1) The trial court erred in overruling defendant's motion to suppress; (2) the trial court overruled defendant's motion for a new trial when it became aware that the State's expert witness had misrepresented his credentials; and (3) the trial court committed an abuse of discretion in imposing a clearly excessive sentence on the defendant. We affirm.

Defendant contends the affidavit in support of the application for the search warrant was not legally sufficient to constitute probable cause for the issuance of the warrant. The affidavit and application for issuance of a search warrant made by an Omaha police officer on June 5, 1973, states, so far as material herein, as follows: "That he has just and reasonable grounds to believe,

and does believe that there is concealed or kept as here-inafter described, the following property, to-wit:   Opium or its derivatives, Cocaine, Marijuana or its derivatives, or any other illegally possessed drugs, and instruments for administering the afore mentioned drugs, either homemade or manufactured.

"That said property is concealed or kept in, on, or about the following described place or person, to-wit: GLOUSER, Barbara Jean - White female - 33 Years old DOB 6 Jan 1940 - 5 foot 4 in. 110 to 120 pounds.   OPD # 70143 also she will have in her possession some suit cases and bags.

"That said property is under the control or custody of GLOUSER, Barbara Jean OPD # 70143.

"That the following are the grounds for issuance of a search warrant for said property and the reasons for his belief, to-wit:   On 5 June 1973 Sgt. R. R. Caruso of the narcotic office received a telephone call from a person who has given the Officers in the narcotic office information in the past that has been found to be good reliable information and has resulted in the arrest of several parties on drug charges and also has resulted in the recovery of large amounts of narcotics and drugs. The informant stated that a person was taking flights to and from San Diego, Calif. leaving and coming back on the same day.   Also this party was taking these flights just a few days apart.   The informant stated the name being used by this party was B. GLOUSER.   Officers R. Wiese and K. A. Miller took a police mug photo of a party known to them as GLOUSER, Barbara Jean OPD # 70143 and she was named as the party taking the flights.   One of the flights was to San Diego, Calif. on Friday 1 June 1973 and she returned the same night. She then left on a flight to San Diego, Calif. on Monday 4 June 1973 with reservation to return the same night but did not board this flight.   She is on a plane now which left San Diego, Calif. on Tuesday morning 5 June 1973 and due to arrive in Omaha, Nebraska at

1335 hours on Tuesday 5 June 1973. The informant further stated she travels with a very small amount of luggage. It is known by Officers R. Wiese and K. A. Miller that GLOUSER, Barbara Jean is married to a GLOUSER, Larry and both parties have police records with the Omaha Police Dept. of past Drug and narcotic arrests. Information from other reliable sources state that Larry GLOUSER is still involved in the narcotic operation within the City of Omaha. It is the Officers opinion that GLOUSER, Barbara Jean is bringing narcotics back to Omaha from the San Diego, Calif. or Mexico area. Officers are requesting this search warrant in order to search the person of GLOUSER, Barbara Jean and any or all of the luggage that she might have."

Defendant contends there is no information presented in the affidavit which shows the underlying circumstances from which the informant drew the conclusions related and that the affidavit does not supply sufficient information to support the reliability of the informant. In State v. LeDent (1970), 185 Neb. 380, 176 N. W. 2d 21, we held: For an affidavit (based upon) a tip from an informant to be sufficient, the magistrate must be informed of (1) some of the underlying circumstances from which the informant concluded that the narcotics were located where he claimed they were, and (2) some of the underlying circumstances from which the officer concluded that the informant was credible. The affidavit herein meets these two tests. Sufficient underlying circumstances are set out and sufficient information to support the reliability of the informant is given. We must not lose sight of the principle enunciated in Le-Dent: "Affidavits for search warrants must be tested in a common sense, realistic fashion."

Defendant also contends that the question of the sufficiency of the affidavit, which is based on hearsay information supplied by an unknown person, requires that every item of the affidavit be subjected to precise judicial scrutiny, separately and independently, to deter-

mine whether the affidavit passes constitutional muster. Additionally, defendant raises several other alleged deficiencies in the affidavit, none of which merit discussion.

This case, on its facts, is not too different from Draper v. United States (1959), 358 U. S. 307, 79 S. Ct. 329, 3 L. Ed. 2d 327, where the question involved was whether the arrest, search, and seizure were lawful where no search warrant was involved. In Draper a federal narcotics agent was told by an informer, whose information the agent had always found to be accurate, that petitioner whom the agent did not know but who was described by the informer, was peddling narcotics and had gone to Chicago to obtain a supply and would return on a certain train on a certain day or the day after. The agent met the train, easily recognized the petitioner from the informer's description, and without a warrant arrested him, searched him, and seized narcotics and a hypodermic syringe found in his possession. These were later admitted in evidence over the objection of petitioner at the trial at which he was convicted of violating a federal narcotics law. The Supreme Court held that even if the information received by the agent from the informer was hearsay, the agent was legally entitled to consider it in determining whether he had probable cause within the meaning of the Fourth Amendment to the United States Constitution, and reasonable grounds within the meaning of 26 U. S. C., section 7607, to believe that petitioner had committed or was committing a violation of the narcotic laws. The information in the possession of the narcotic agent was sufficient to show probable cause as well as reasonable grounds to believe that petitioner had violated or was violating the narcotic laws and to justify his arrest without a warrant. The arrest was lawful and the subsequent search and seizure having been made incident to a lawful arrest were likewise valid.

United States v. Harris (1971), 403 U. S. 573, 91 S. Ct. 2075, 29 L. Ed. 2d 723, teaches that an affidavit for a

search warrant may be based on hearsay information and need not reflect direct observations of affiant so long as the magistrate is informed of some of the underlying circumstances supporting the affiant's conclusions. In Harris, the affidavit unlike Jones v. United States (1960), 362 U. S. 257, 80 S. Ct. 725, 4 L. Ed. 2d 697, did not aver that the informant had previously given "correct information." The court held this was not essential when supported by other information. The instant case is analogous to Jones which did give sufficient information for the magistrate to judge the reliability of the informant.

In Spinelli v. United States (1969), 393 U. S. 410, 89 S. Ct. 584, 21 L. Ed. 2d 637, which is cited extensively by defendant, the court said: "The detail provided by the informant in Draper v. United States * * * provides a suitable benchmark. * * * A magistrate, when confronted with such detail, could reasonably infer that the informant had gained his information in a reliable way[5]." Footnote No. 5 reads: "While Draper involved the question whether the police had probable cause for an arrest without a warrant, the analysis required for an answer to this question is basically similar to that demanded of a magistrate when he considers whether a search warrant should issue."

The affidavit herein was sufficient to justify the issuance of the search warrant. It goes to great lengths to outline the underlying circumstances from which the informant concluded the articles were located on the person or in the baggage of the defendant. The flights and the short intervals between departure and return; the very small amount of luggage taken on the flights; and the fact that the flights were to an area of known drug source, as well as the information that the defendant and her husband had a history of association with drugs, would reasonably indicate to a magistrate a drug operation. The underlying circumstances from which the officer concluded the informant was credible

are stated. He had given reliable information in the past, which had resulted in several arrests as well as the recovery of large amounts of narcotics. Testing this affidavit in a common sense, realistic fashion, we can come to but one conclusion: It was amply sufficient to justify the search warrant.

Defendant's next major assignment is that the lower court erred in overruling her motion for new trial based upon newly discovered evidence. Hugh J. McGuire, a chemist, who identified the substance seized as heroin, testified that he held a Bachelor's degree in chemistry and had taken graduate training. In support of her motion for new trial defendant adduced that Mr. McGuire had not received a Bachelor's degree from Creighton University and had not taken graduate training as per his testimony. The court found that neither defendant's counsel nor the Douglas county attorney had reason to believe at the time of the trial that McGuire's testimony as to his academic credentials was inaccurate.

The contention raised by defendant on the motion for new trial is that McGuire's lack of academic credentials renders him incapable of qualifying as an expert witness and giving any opinion as to the result of his analysis of the substance seized. The lower court overruled the motion for new trial, and held: "* * * there is no rational basis to conclude that the discrediting evidence that McGuire did not have a degree or that his training in the various tests were not graduate work, even might have changed the result."

The State agrees that the discovery of Mr. McGuire's falsification of his credentials would constitute newly discovered evidence. The issue is the effect of the falsification of an expert witness' credentials. A motion for new trial for newly discovered evidence will not be granted where the other evidence is sufficient to sustain the verdict. The newly discovered evidence offered in this case is of an impeaching character to discredit the witness.

While the precise issue of the falsification of the credentials of an expert witness has not heretofore been presented to this court, the New Jersey Superior Court considered the precise issue involved in Ginnelly v. Continental Paper Co. (1959), 57 N. J. Super. 480, 155 A. 2d 154. There the witness, who qualified as a construction expert and construction engineer, falsely represented that he had been graduated from Catholic University with a degree in architectural engineering. In overruling the motion for a new trial, the court held: "But more fundamentally, the test is whether the evidence of the plea and conviction, if competent, would probably alter the judgment. In view of the undisputed fact that the witness had four years of preparatory engineering at Stevens, four years of architectural engineering at Catholic University (*without* receiving a degree), and 38 years' experience in the construction and engineering business, we are not prepared to say that the trial judge abused his discretion in ruling that a correct statement of Connolly's qualifications would not probably alter the result."

Did the trial court abuse its discretion in refusing to grant a new trial herein? In Finnern v. Bruner (1960), 170 Neb. 170, 101 N. W. 2d 905, we held: "The newly discovered evidence must be of such a nature that if offered and admitted at the former trial it probably would have produced a substantial difference in result. Such evidence must be competent, material, and credible, and not merely cumulative. It must involve something other than the credibility of witnesses who testified at the former trial. It must appear that the unsuccessful party had no knowledge of the newly discovered evidence at the previous trial and could not have discovered it by the exercise of reasonable diligence."

In State v. Wycoff (1966), 180 Neb. 799, 146 N. W. 2d 69, we said: "A new trial will not ordinarily be granted for newly discovered evidence which, when produced, will merely impeach or discredit a witness who testified

at the trial." If the probable result of the new evidence would be a different verdict, a new trial should be granted. Such new evidence, therefore, must be of such a character as to render clear and positive that which was before equivocal and uncertain, and be so important to the issues involved as to indicate that upon another trial a different result will probably be reached.

The evidence adduced shows that while McGuire does not have a degree from Creighton University, he has taken 135 hours at that university. He achieved passing grades in 129 hours between 1955 and 1960. His general scholarship was average to below average. Since that time, McGuire has done extensive drug analysis while acting as a chemist and in particular a toxicologist at Luthern Medical Center. He was familiar with and conducted the several tests recognized and available to analyze a sample for the presence or absence of a controlled substance. The principal tests utilized are known as thin layer chromatography, infrared spectral analysis, gas chromatography, and ultra-violet spectral analysis. He took on-the-job training in courses provided by manufacturers of the equipment necessary to conduct these tests.

Both witnesses for the State and the defense, including a qualified chemist at the Lutheran Medical Center laboratory, testified that McGuire was competent to perform the accepted tests utilizing the instruments and equipment in the Lutheran laboratory. In addition, the evidence is very persuasive from several witnesses that while appropriate academic background is relevant, it is considerably less important in the area of toxicology than the ability and competence to perform the tests. The evidence of McGuire's background and training is more than adequate to qualify him as an expert witness notwithstanding his admitted lack of academic credentials.

McGuire's cross-examination at the trial was very limited. The lack of academic credentials, in view of

his extensive background and training in analysis of controlled substances, would not have disqualified him as an expert witness. We agree with the trial judge: "It would be sheer speculation to conclude that the newly discovered evidence would have discredited McGuire to the extent that it probably would have produced a different result or that it even 'might have changed the result' * * *."

Mr. McGuire had been working in the laboratory at Lutheran Medical Center for 13 years. He had done extensive drug analysis while working as a chemist and toxicologist, to the extent of some 500 tests per month between 1971 and 1972. We agree with the trial judge, there is no rational basis to conclude that the discrediting evidence that Mr. McGuire did not have a degree or that his training in various tests was not graduate work would have changed the result. Or, as we phrase it, on this record we cannot say that the new evidence is of so controlling a nature as to probably change the result of the former trial, which is the test we must apply. The trial judge did not abuse his discretion in overruling defendant's motion for a new trial.

Defendant's last assignment of error is that the trial court abused its discretion in imposing a clearly excessive sentence. Defendant was sentenced to 10 years confinement in the State Reformatory for Women. The minimum sentence allowed for the charge of possession of a controlled substance with intent to deliver is 1 year, and the maximum is 10 years. § 28-4,125, R. S. Supp., 1973. Where, as here, the court sets a definite term of years, the minimum sentence becomes the minimum provided by law. § 83-1,105, R. S. Supp., 1972. There is no question the trial judge intended to give defendant the maximum penalty for the offense. Obviously he has not done so.

The sentencing herein was combined with a sentencing on a forgery conviction. The defendant was given the maximum of 10 years on the forgery conviction. This

again being a sentence for a term of years, the minimum is 1 year. The sentence on the forgery conviction was to be consecutive with the sentence imposed herein. Actually, the defendant received two sentences of 1 to 10 years, to be served consecutively and not concurrently. The net effect is the same as a 2 to 20 year sentence. Defendant will be eligible for parole consideration at the expiration of 2 years.

Viewing the situation in the light of the record, we come to the conclusion that the trial judge did not abuse his discretion. The judgment is affirmed.

AFFIRMED.

McCOWN, J., dissenting as to sentence.

The defendant here, at a single sentencing hearing, was sentenced to 10 years imprisonment on a forgery charge and 10 years imprisonment on a charge of possession of a controlled substance with intent to deliver, with the sentences to run consecutively rather than concurrently. The minimum sentence allowed by law for each of the two offenses was 1 year. The maximum sentence on the controlled substance charge was 10 years, and on the forgery count, 20 years.

The defendant had no convictions and apparently no criminal record prior to the sentencing here. She was 32 years old and the mother of two teenage daughters. In my opinion a maximum 10-year sentence on one count, and a sentence 9 years more than the minimum on the other, with the sentences to run consecutively, is excessive for a first time criminal offender under the facts of these cases.