REPORTED
IN THE COURT OF SPECIAL APPEALS
No. 2469
September Term, 2013

ROBERT ANTHONY MCGHIE

v.

STATE OF MARYLAND

Graeff,
Kehoe,
Alpert, Paul E.
   (Retired, Specially Assigned),

JJ.

Opinion by Graeff, J.

Filed: August 26, 2015

This appeal involves a Petition for Writ of Actual Innocence filed by Robert Anthony McGhie, appellant, in the Circuit Court for Montgomery County. The petition, which was filed almost 20 years after appellant's conviction for murder and related offenses, was based on evidence that the State's ballistics expert, Joseph Kopera, who testified at appellant's 1994 trial, lied about his educational qualifications. The circuit court denied appellant's petition, finding that he failed to prove that the evidence of Mr. Kopera's duplicity created a "substantial or significant possibility" that the result of the trial would have been different.

On appeal, appellant presents the following question for our review:

Did the trial court err when it denied appellant's Petition for Writ of Actual Innocence?

For the reasons set forth below, we shall affirm the judgment of the circuit court.

## FACTUAL AND PROCEDURAL BACKGROUND

On January 31, 1994, Edward Borrero and Terrance Robinson went to visit a man known to them as "Mike" at Mike's apartment in the District of Columbia.[1] Once Mr. Borrero and Mr. Robinson arrived at Mike's apartment, Mike told them that "he had a little store that [they] could hit," and he drew a blueprint of how it would look inside. The store, "American Mailbox," was in Montgomery County, Maryland, near the District of Columbia line. Mike stated that cash would be stored in the back filing cabinet and could total as

---

[1] The record reflects that Mike's full name is Frederick DeSuzar. Apparently, Mike is also known as Nathaniel McLean. Throughout appellant's trial, however, witnesses referred to this man as "Mike." We shall do the same.

much as $80,000. Approximately ten minutes after Mr. Borrero and Mr. Robinson arrived at Mike's apartment, appellant joined them.

The four men, with Mike as their leader, drove a Chevrolet Celebrity to the apartment of Mike's girlfriend, Angie, to obtain a handgun. Mike went into the apartment building, and he and Angie returned with a 9mm handgun, which he handed to Mr. Borrero. Mike explained to the group that the plan was for Angie to enter the store first, and then, to create a diversion, one of the men would pretend to abduct her.

Mr. Borrero drove a Chrysler New Yorker to American Mailbox, and the others, appellant, Mike, Mr. Robinson, and Angie, rode in the Celebrity. While en route to American Mailbox, however, Angie decided that she did not want to participate in the robbery, so they turned around and dropped Angie off at her apartment.

Once at Angie's apartment, Mike told Mr. Borrero to park the New Yorker and get into the Celebrity with the others so that they could all "drive by the store." As the men drove by American Mailbox, Mike pointed out that the store had two exits, one on Eastern Avenue and the other on Georgia Avenue. He suggested that the men use the Eastern Avenue exit during the planned robbery.

Not yet ready to go through with their plan, the men returned to where the New Yorker was parked. The men drove to Peabody Street, where Mike retrieved a .38 revolver from a woman named Vanessa Hood. Mr. Robinson was to use that gun in the robbery. At that point, the plan was for Mr. Borrero, who had the 9mm gun, and Mr. Robinson, who had

the .38 revolver, to rob the store while appellant and Mike waited close by. The men headed to American Mailbox; Mike and appellant rode in the New Yorker and Mr. Borrero and Mr. Robinson rode in the Celebrity.

When they arrived at American Mailbox, Mr. Borrero and Mr. Robinson entered the store, and Mike and appellant parked the New Yorker on a nearby side street. Mr. Borrero approached the counter with a few items for purchase, reached into his pocket as if to obtain money, and pulled out a gun. The owner of the store, Joseph Atkins, reached across the counter, apparently to defend himself, and Mr. Borrero shot him in the face.

Mr. Borrero and Mr. Robinson then searched the back of the store for money, but they could not find any. As they were leaving the store, a neighboring merchant, Randolf Covington, entered the store. Mr. Borrero shot Mr. Covington twice, and he shot Mr. Atkins in the arm before leaving. Mr. Covington died from his injuries.

Mr. Borrero and Mr. Robinson left the store, entered the Celebrity, and drove it until they located Mike and appellant. They then parked the Celebrity, leaving it near the crime scene, and joined Mike and appellant in the New Yorker. The men returned to Ms. Hood's apartment on Peabody Street, and Mike gave her both the .38 revolver and the 9mm that Mr. Robinson and Mr. Borrero carried during the crime.

While all four men were at Ms. Hood's apartment, her 19-year-old son, Vandell Roseman, arrived. Appellant asked Mr. Roseman to drive him to pick up another vehicle. Mr. Roseman agreed, and appellant gave Mr. Roseman the keys to the New Yorker.

Appellant, sitting in the passenger seat of the New Yorker, directed Mr. Roseman toward American Mailbox. As they neared the store, they saw a lot of law enforcement personnel and crime tape surrounding the area. Appellant told Mr. Roseman to "forget it and just go back home." When Mr. Roseman returned home, Mr. Borrero and Mr. Robinson were gone, but Mike was still with Ms. Hood. Appellant and Mike then left in the New Yorker.

A few days later, Ms. Hood spoke with a friend and realized that there may have been a connection between the guns that Mike gave her on January 31st and a shooting that occurred that day. Ms. Hood decided that she needed "to get rid of" the guns. She gave them to Mr. Roseman, who threw them in a trash can.

Barbara Rogers testified that, in October 1993, Mike and appellant moved into an apartment she had in the District of Columbia. They had moved out by January 31, 1994, the date of the shooting. That day, however, Mike returned to the apartment to gather some of his belongings that he had left there. Both appellant and Mike were "in and out" of Ms. Rogers' apartment all day.

Ms. Rogers overheard Mike telling appellant that he had just returned from a "sweet spot," where there was $80,000, no security, and only one girl working. Appellant responded that "he was for it," exclaiming: "Let's take the motherfucking joint." The two men then discussed what they would do with the $80,000 they hoped to steal. Shortly thereafter, two young men, Mr. Borrero and Mr. Robinson, came to the apartment.

-4-

Ms. Rogers did not want the young men in her apartment because "[t]hey should have been in school," and the four men discussed plans to meet elsewhere.

A few days later, appellant and Mike again were at Ms. Rogers' apartment. Ms. Rogers heard appellant brag that he could not be implicated in the crime because he had not actually entered American Mailbox, his fingerprints had not been left on anything, and no one had seen him there. She also heard appellant lamenting that one man died, but appellant "didn't get a damn dime."

Appellant testified in his defense and denied any involvement in the shootings. Appellant's girlfriend, Yvonne Davis, testified that, approximately a week before the shootings, appellant had fired a gun in the District of Columbia.

Mr. Kopera, an employee of the Maryland State Police Ballistics Laboratory, testified that, in his expert opinion, the gun that was fired at American Mailbox was the same gun that had been fired a week earlier in the District of Columbia. With regard to his qualifications as an expert in firearms and ballistics identification, Mr. Kopera testified that he had been working with the Maryland State Police Ballistics Laboratory in the Crime Lab for more than three years, and before that, he had spent 22 years with the Baltimore City Crime Lab in their ballistics unit. He had testified numerous times in state courts in Maryland, as well as in Pennsylvania, Delaware, Virginia, and various federal courts. He personally conducted between 1,200 and 1,400 ballistics examinations each year. When asked about the training he had received, Mr. Kopera responded:

There are no colleges or universities that offer a degree in the field specifically of ballistics or firearms identification, so all knowledge of the field is done by way of on-the-job training.

I spent a tenure of five years on-the-job training with the FBI and also with the Baltimore City Firearms Laboratory before becoming court-qualified.

Before this training, we must fit the qualifications as far as educational background to get into the field.

The State Police and also the Baltimore City Crime Lab and the FBI require a science-related degree in a field relative - - in an area relative to your field.

I [have] a degree in engineering from the University of Maryland here in the State of Maryland and also an engineering degree from the Rochester Institute of Technology in the state of New York.

I am a graduate of the FBI Academy in the field[] of ballistics. I am on the board of directors for the Association of Firearm and Tool Mark Examiners, which is the governing agency of firearms experts here in the United States and many countries abroad.

The court accepted Mr. Kopera as an expert. Defense counsel did not object or ask Mr. Kopera any questions regarding his credentials.

Ultimately, the jury convicted appellant of murder, attempted murder, two counts of use of a handgun in the commission of a felony or crime of violence, attempted robbery with a dangerous weapon, and conspiracy to commit robbery with a dangerous weapon. The circuit court sentenced appellant to life imprisonment on both the murder and attempted murder convictions, and it imposed concurrent terms of imprisonment for the other convictions.

-6-

Appellant appealed, and this Court affirmed in an unreported opinion. *Robert Anthony McGhie v. State of Maryland*, No. 1883, Sept. Term, 1994 (filed Nov. 24, 1995). Appellant also filed a motion for a new trial, a motion for post-conviction relief, and a motion to revise his sentences. Appellant was denied relief on each occasion.

In 2007, almost thirteen years after appellant's convictions, an attorney in the Office of the Public Defender discovered discrepancies in Mr. Kopera's testimony over the course of the many years that he served as an expert witness for the State. Further investigation revealed that Mr. Kopera had lied about having a Bachelor of Science degree in engineering from the University of Maryland and the Rochester Institute of Technology. Mr. Kopera did not hold a degree from either institution.

Appellant then filed his Petition for Writ of Actual Innocence, alleging that, in December 2011, he learned, based on a letter from the Office of the State's Attorney, that Mr. Kopera perjured himself at appellant's trial. In addition to a claim relating to the false testimony regarding Mr. Kopera's credentials, he asserted that the "chain of custody for the ballistics evidence [was] also at issue and/or potentially [compromised] as it [was] speculative as to whether the evidence was returned from Mr. Joseph Kopera without being changed or altered in any fashion." He alleged that, "without the contested ballistics results and perjured testimony of Mr. Joseph Kopera, a jury could not [have] convict[ed] him of the alleged crimes." Appellant asserted that this evidence "creat[ed] a substantial or significant possibility that the result may have been different" and "this newly discovered information

could not have been discovered in time to move for a new trial under Maryland Rule 4-331."[2]

At the hearing on his petition, appellant, through counsel, relied on the exhibits to his petition and made oral argument.[3]  The court ultimately rejected the petition.

The court first addressed the State's claim that appellant had waived his claim because Mr. Kopera's duplicity could have been discovered in time to move for a new trial. It disagreed, stating:

> To hold defense counsel to the requirement of a background check of an expert who had testified in scores of cases is unrealistic.  Indeed, the State – which should bear some responsibility for its own expert's mendacity – was likewise in the dark about the situation.  Why should a greater burden devolve upon the defense?

The court found, however, that appellant had not proven that the newly discovered evidence that Mr. Kopera lied about his qualifications as an expert created a substantial or

---

[2] Originally, appellant also based his petition on allegations that another State's witness, Edward Borrero, perjured himself at trial.  During the hearing on his Petition for Writ of Actual Innocence, however, appellant dismissed any allegation of "newly discovered evidence" based on Mr. Borrero's allegedly perjured testimony.

[3] Those exhibits included: (1) a March 8, 2007, letter from the Maryland State Police advising the State's Attorney for Montgomery County that it had confirmed discrepancies in the credentials of Mr. Kopera regarding his education; and (2) an affidavit from William Conrad, a Forensics Firearms Consultant, which stated that: (a) although Mr. Kopera testified that he was a graduate of the FBI Academy in the field of firearms identification, there was no such course offered by the FBI Academy; and (b) Mr. Kopera's opinions "were beyond the capability of a qualified examiner to make, with the evidence that was provided." At the hearing on appellant's Petition for Writ of Actual Innocence, newspaper articles reporting that police investigators had confirmed that Mr. Kopera did not, as he testified, hold degrees from the Rochester Institute of Technology or the University of Maryland were admitted.

significant possibility that the jury's verdict may have been different. In addressing this claim, the court first considered the appropriate analysis to employ, stating: "Does the court (a) simply excise the false testimony and then, based on the remaining evidence, determine whether the result would have been different, or (b) consider whether the result would have been different if it was revealed during the trial that [Mr.] Kopera's educational qualifications were exaggerated?" Noting that this Court had employed the former approach in *Kulbicki v. State*, 207 Md. App. 412, 428 (2012), *rev'd on other grounds*, 440 Md. 33 (2014), *petition for cert.*, ___ U.S. ___, No. 14-848 (filed Jan. 16, 2015), a post-conviction case addressing the materiality of Mr. Kopera's false testimony regarding his credentials, the court stated that "the proper standard to utilize is the simple excision of the questioned testimony, and determination of whether there would then exist a 'substantial or significant' possibility of a different verdict." Given this standard, the court stated that

> it is patent that the jury would not have been influenced in any way – much less substantially or significantly – by the lack of testimony concerning [Mr.] Kopera's college education. No undergraduate degree is apparently offered in the field of ballistics. [Mr.] Kopera undoubtedly would have qualified as an expert witness without the false testimony, just as he did in scores of previous trials. His expertise was in no way challenged at [appellant's] trial.

Moreover, the court stated that the prosecution referred to [Mr.] Kopera "only in passing" during closing argument, and appellant's attorney never mentioned him at all. The court stated that [Mr.] Kopera's testimony, "while helpful to the State, was not central to the case."

The circuit court, nevertheless, addressed the alternative standard and concluded that, even if it assessed the possible outcome if the jury had known of [Mr.] Kopera's dishonesty,

it would not have affected the verdict. The court stated that, aside from the ballistics evidence, there was "ample testimony" directly implicating appellant in the murder. The court explained:

> [Ms.] Hood testified that [appellant] and his three co-conspirators came to her home the afternoon after the murder, leaving two handguns on her bed. [Appellant] and another had visited earlier in the day to pick up one of the weapons.
>
> During this time, a news bulletin was broadcast on the television which described the murder. Ms. Hood's son, [Mr.] Roseman, testified that [appellant] had him drive past the scene of the shootings that same afternoon, presumably to see what investigation was taking place, and perhaps to see what had become of the abandoned automobile that transported the conspirators to the murder scene. [Mr.] Roseman later disposed of the two guns, at his mother's request. [Appellant] told [Mr.] Roseman, after cruising by the murder scene, to "forget it and just go back home."[]
>
> [Mr.] Borrero, who shot the murder victim, testified to [appellant's] presence during the planning stage of the crime and during the getaway. [Appellant] also partook of the marijuana the participants smoked during the preliminary "ride-by", ostensibly to fortify themselves, before the murder.
>
> [Ms.] Rogers heard [appellant] discussing the crime before its consummation, telling a confederate[:] "Let's take the motherfucking joint." He said he was going to get a nice car with his share of the money, thought to be $80,000.00, that would be the fruit of the intended robbery. After the crime, she heard him lament that a man was dead, and that [appellant] "didn't get a damn dime." He also was apparently heartened by the fact that his fingerprints were nowhere to be found at the crime scene.
>
> Of special significance, [appellant] took the witness stand and testified at trial. While Ms. Rogers' motives for testifying were vigorously challenged by the defense on cross-examination and in closing argument, never did [appellant] even attempt to rebut or refute Ms. Rogers' testimony regarding his incriminating statements, and her testimony stands uncontradicted.

Accordingly, the court determined that appellant "was not prejudiced by [Mr.] Kopera's duplicity, and there was no substantial or significant possibility that the result of the trial would have been favorable to [appellant], whether the testimony was presented to the jury or not."

This appeal followed.

## DISCUSSION

Appellant contends that the circuit court erred in denying his Petition for Writ of Actual Innocence. He asserts that the newly discovered evidence that Mr. Kopera lied about his educational background created a substantial or significant possibility that the result of the trial would have been different.

The State contends that the circuit court properly exercised its discretion in denying appellant's Petition for Writ of Actual Innocence. It asserts that appellant was not entitled to relief because he failed to show any of the following three substantive requirements that must be met to be eligible for relief: (1) that the newly discovered evidence could not have been discovered with due diligence in sufficient time to move for a new trial under Maryland Rule 4-331; (2) that the evidence was material, not merely impeaching; and (3) that there was a "significant possibility" that the outcome of the trial would have been different had the newly discovered evidence been known at the time of trial.

Maryland Code (2012 Supp.) § 8-301 of Criminal Procedure Article ("CP"), permits

a defendant to file a petition for writ of actual innocence. It provides, in pertinent part, as

follows:

*Newly Discovered Evidence*

**§ 8-301. Petition for writ of actual innocence.**
    (a) *Grounds.* — A person charged by indictment or criminal information
with a crime triable in circuit court and convicted of that crime may, at any
time, file a petition for writ of actual innocence in the circuit court for the
county in which the conviction was imposed if the person claims that there is
newly discovered evidence that:
        (1)  creates a substantial or significant possibility that the result may
have been different, as that standard has been judicially determined; and
        (2) could not have been discovered in time to move for a new trial
under Maryland Rule 4-331.[4]

***

    (g) *Burden of proof.*  A petitioner in a proceeding under this section has the
burden of proof.

In addressing a circuit court's decision, after a hearing, to deny a petition for writ of

actual innocence, we limit our review to whether the circuit court abused its discretion.

*State v. Hunt*, ___ Md. ___, Nos. 72 and 73, Sept. Term, 2014, slip op. at 9 (filed June 18,

2015); *Jackson v. State*, 216 Md. App. 347, 363, *cert. denied*, 438 Md. 740 (2014).  In that

regard, we will not disturb the circuit court's ruling, unless it is "'well removed from any

_____

    [4] Maryland Rule 4-331(c) provides, in relevant part, that a court may grant a new trial
on the ground of newly discovered evidence if the motion is "filed within one year after the
later of (A) the date the court imposed sentence or (B) the date the court received a mandate
issued by the final appellate court to consider a direct appeal from the judgment or a belated
appeal permitted as post conviction relief," and the evidence could not have been discovered
by due diligence earlier.

center mark imagined by the reviewing court and beyond the fringe of what the court deems minimally acceptable.'" *Jackson*, 216 Md. App. at 363-64 (quoting *Moreland v. State*, 207 Md. App. 563, 569 (2012)).

## I.

### Due Diligence

We begin our analysis, as did the circuit court, by addressing the requirement that a defendant filing a petition for writ of actual innocence must show that the evidence could not have been discovered in time to file a motion for new trial pursuant to Rule 4-331. This Court recently stated that this requirement is a "threshold question," noting that, "until there is a finding of newly discovered evidence that could not have been discovered by due diligence, no relief is available, 'no matter how compelling the cry of outraged justice may be.'" *Jackson*, 216 Md. App. at 364 (quoting *Argyrou v. State*, 349 Md. 587, 604 (1998)). *See Keyes v. State*, 215 Md. App. 660, 669 (2014) (CP § 8-301(a)(2) defines a due diligence standard by express reference to Rule 4-321). In assessing the "due diligence" requirement in the context of a motion for a new trial pursuant to Rule 4-331(c), the Court of Appeals has interpreted the term "due diligence" as requiring that a litigant "act reasonably and in good faith to obtain the evidence, in light of the totality of the circumstances and the facts known to him or her." *Argyrou*, 349 Md. at 604-05.

As our analysis in this case will show, the standard of review that this Court applies to the trial court's finding in this regard is critical. In *Jackson*, 216 Md. App. at 364-66, this

Court addressed the same issue presented here, i.e., whether Mr. Kopera's false statements regarding his educational background could have been discovered by due diligence in time to move for a new trial. In that case, the circuit court, noting that another lawyer had discovered the misstatements, made a factual finding that appellant had failed to show that the evidence could not have been discovered by due diligence. *Id.* at 365. Reviewing that finding pursuant to the abuse of discretion standard, we upheld the court's ruling, stating that "the circuit court did not abuse its discretion in finding that appellant failed to show that the evidence could not have been discovered in the exercise of due diligence. *Id.* at 366.

The circuit court's factual finding in this case, however, was completely different. Here, the circuit court stated:

> There is no evidence that was presented to this court to demonstrate that Kopera was exaggerating his qualifications prior to Petitioner's trial in 1994. Apparently, no red flags had been raised from Kopera's testimony in other cases that would require a competent defense attorney to question Kopera's pedigree, collegiate record, or the like.
>
> No opportunity to depose an expert in a criminal case is generally afforded to the defendant, unlike in civil cases. To hold defense counsel to the requirement of a background check of an expert who had testified in scores of cases is unrealistic. Indeed, the State—which should bear some responsibility for its own expert's mendacity—was likewise in the dark about the situation. Why should a greater burden devolve upon the defense?

As in *Jackson*, 216 Md. App. at 363-64, our analysis focuses on whether the circuit court's finding in this regard constituted an abuse of discretion. We cannot so conclude. *See Hunt*, slip op. at 27-28 ("[I]t would not be an abuse of discretion for a hearing judge to find that a defense attorney might fail, after nonetheless exercising due diligence before the

-14-

revelations of 2007, to discover Kopera's alleged fraud.").[5]  Accordingly, we uphold the

circuit court's finding that appellant has satisfied the requirement that he show that the

newly discovered evidence could not have been discovered in time to move for a new trial.

## II.

## Impact of the Evidence

We thus turn to the second requirement, that the evidence created "a substantial or

significant possibility that the result may have been different, as that standard has been

judicially determined."  CP § 8-301(a)(1).  The Court of Appeals, in the context of a motion

for new trial, has stated:

> In order for the newly discovered evidence to warrant a new trial, the trial
> judge must find it to be both material and persuasive such that "[t]he newly
> discovered evidence may well have produced a different result, that is, there
> was a substantial or significant possibility that the verdict of the trier of fact
> would have been affected."

*Campbell v. State*, 373 Md. 637, 366-67 (2003) (quoting *Yorke v. State*, 315 Md. 578, 588

(1989)).  In *Stevenson v. State*, 299 Md. 297, 301-02 (1984), the Court indicated that, in

deciding whether to grant a new trial based on newly discovered evidence, the court should

address first whether evidence is material, and if that is the case, then "the court inquires into

the possible impact the newly discovered evidence would have on the outcome of the trial."

---

[5] Our decision affirming the finding of a lack of due diligence in *Jackson* and our decision affirming the finding rejecting a claim of a lack of due diligence are not inconsistent.  Rather, they illustrate the lens through which this Court reviews a trial court's decision.  Opposite conclusions can be reached by trial courts and still be affirmed pursuant to our review for an abuse of discretion.

In *Jackson*, 216 Md. App. at 367-71, this Court began with the analysis whether Mr. Kopera's false testimony regarding his educational credentials was material. We explained that both this Court and the Court of Appeals have stated that, to be material, evidence must be more than "'merely cumulative or impeaching.'" *Id.* at 367. *See Argryou*, 349 Md. at 601; *Jackson v. State*, 164 Md. App. 679, 697-98 (2005). In the 2005 *Jackson* case, this Court distinguished between newly discovered evidence that was "pivotally important," such as evidence that a witness lied about the merits of the case, which would be considered coincidentally impeaching, and newly discovered evidence that bore on a witness' credibility, which would "constitute collateral impeachment" and "be 'merely impeaching.'" *Jackson*, 164 Md. App. at 697-98.

With that background in mind, in the 2014 *Jackson* case, we agreed with the circuit court that the evidence that Mr. Kopera lied about his qualifications "was not material, but merely impeaching." *Jackson*, 216 Md. App. at 369. We noted that there was "no contention that Mr. Kopera's testimony regarding his ballistics analysis was false or incorrect. Rather, the newly discovered evidence alleged in the petition was limited solely to evidence that Mr. Kopera did not attend the University of Maryland or Rochester Institute of Technology." *Id.* Given Mr. Kopera's extensive experience in ballistics, we agreed with the State that Mr. Kopera's claim "'to have college degrees that he did not actually possess has nothing whatsoever to do with the accuracy of his conclusion concerning the distance [Mr.] Bey was from the gun when he was shot,' and that a bullet fragment found on the first

floor was fired from the same gun used in the murder." *Id.* at 371. *Accord Kulbicki v. State*, 207 Md. App. at 447 (falsity of Mr. Kopera's testimony was not material because "there simply [was] no likelihood that the jury's determination would have been influenced by the fact that Mr. Kopera did not have the academic credentials he claimed," noting that "ballistics is a field for which no college degree is offered, and the expertise for the field is usually based on experience, which Kopera had in copious amounts.").

Other courts have applied a similar analysis in holding that a new trial is not warranted where an expert testifies falsely about his or her credentials. In *State v. Glouser*, 226 N.W.2d 328, 331-32 (Neb. 1975), the Supreme Court of Nebraska addressed whether a new trial was required when, similar to the facts here, the State's expert falsely testified that he had received a Bachelor's degree. After stating that newly discovered evidence justifying a new trial must involve something other than the credibility of the witness, the court addressed whether the expert's lack of academic credentials would have disqualified him as an expert witness. *Id.* at 197-99. Noting that the chemist had extensive experience in analysis of controlled substances, the court held that his lack of a degree would not have disqualified him as an expert or discredited him to the extent that it probably would have produced a different result at trial. *Id.* at 199. *Accord Howard v. State*, 945 So. 2d 326, 370-71 (Miss. 2006) (alleged false testimony by expert did not require a new trial because it related to the expert's background and competence, not the witness' conclusion that Howard bit the victim, and therefore, it was not reasonably likely that it affected the

-17-

judgment of the jury).  *See also United States v. Price*, 357 F. Supp. 2d 63, 69 (D.D.C.

2004) (rejecting claim of ineffective assistance of counsel based on the failure to discover

false testimony of expert regarding credentials where the expert's testimony focused on other

expertise, and therefore, the failure to investigate the credentials did not result in any

prejudice).

The trial court in this case assessed the evidence pursuant to this reasoning.  It

determined that "there is no possibility that the jury would have reached a different

conclusion without the educational testimony of [Mr.] Kopera.  He would have qualified as

an expert based upon his on-the-job-training, and the many instances in which he had

previously testified."  We perceive no abuse of discretion in the court's finding that the

newly discovered evidence, which was merely impeaching evidence regarding Mr. Kopera's

qualifications, did not merit the granting of a Petition for Writ of Actual Innocence because

a correct statement of Mr. Kopera's qualifications would not have changed the result of the

trial.

In *Hunt*, slip op. at 28, however, the Court of Appeals suggested disagreement with

this analysis.  In *dicta*, albeit considered *dicta*, the Court questioned the distinction between

"impeaching" evidence (evidence that a witness lied about the merits of the case) and

"merely impeaching" evidence (false evidence bearing on a witness' credibility), indicating

that such a distinction may be considered "overly rigid."  *Id.*  The Court stated: "When an

expert is called to testify, it is conceivable that, based on the cumulative body of evidence

presented at a given trial, falsity regarding the expert's credibility and qualifications might 'create[] a substantial or significant possibility that the result may have been different.'" *Id.* (quoting § 8-301(a)(1)).

In *Jackson*, 216 Md. App. at 374 n.16, we recognized that other courts had held that, "where expert testimony is critical, false testimony about the expert's credentials requires a new trial." Some courts have specifically rejected the argument that a new trial is not warranted when an expert testifies falsely regarding his or her credentials as long as the expert still would have been qualified as an expert, opting instead to consider whether the jury might have reached a different conclusion if the expert testimony had not been admitted. *See, e.g., State v. Griffith*, 161 P.3d 675, 686 (Idaho Ct. App. 2007); *State v. Plude*, 750 N.W.2d 42, 51-56 (Wis. 2008) (where expert testimony is critical to the guilty finding, the misrepresentation may have diminished the credibility of the expert to the extent that it may have affected the judgment of the jury).

In *Jackson*, 216 Md. App. at 373-74, recognizing the alternative analysis adopted by some courts, we addressed whether, assuming "that the jury, having knowledge of Mr. Kopera's false testimony, would have discounted Mr. Kopera's testimony entirely," Jackson would prevail on his petition. *Id.* at 373. In that regard, we noted that Mr. Kopera's substantive testimony in that case was limited, and the evidence of appellant's guilt, without Mr. Kopera's testimony, was compelling. *Id.* at 373-74. Accordingly, because the expert testimony was not critical, we held that the "circuit court did not abuse

its discretion in finding that the newly discovered evidence did not 'create[ ] a substantial or significant possibility that the result may have been different.'" *Id.* at 375 (quoting CP § 8-301).

Similarly, in the present case, the circuit court addressed, as an alternative basis to assess the petition, whether there was a substantial possibility that the verdict would have been different if the jury had known of Kopera's dishonesty and discredited his testimony. The court stated that it "cannot find that the verdict would have been different." The court explained:

> There was ample testimony directly implicating Petitioner in the murder, aside from ballistics evidence. Vanessa Hood testified that Petitioner and his three co-conspirators came to her home the afternoon after the murder, leaving two handguns on her bed. Petitioner and another had visited earlier in the day to pick up one of the weapons.

> During this time, a news bulletin was broadcast on the television which described the murder. Ms. Hood's son, Vandell Roseman, testified that Petitioner had him drive past the scene of the shootings that same afternoon, presumably to see what investigation was taking place, and perhaps to see what had become of the abandoned automobile that transported the conspirators to the murder scene. Roseman later disposed of the two guns, at his mother's request. Petitioner told Roseman, after cruising by the murder scene, to "forget it and just go back home."

> Edward Borrero, who shot the murder victim, testified to Petitioner's presence during the planning stage of the crime and during the getaway. Petitioner also partook of the marijuana the participants smoked during the preliminary "ride-by," ostensibly to fortify themselves, before the murder.

> Barbara Rogers heard Petitioner discussing the crime before its consummation, telling a confederate, "Let's take the motherfucking joint." He said he was going to get a nice car with his share of the money, thought to be $80,000.00, that would be the fruit of the intended robbery. After the crime,

-20-

she heard him lament that a man was dead, and that Petitioner "didn't get a damn dime." He also was apparently heartened by the fact that his fingerprints were nowhere to be found at the crime scene.

Of special significance, Petitioner took the witness stand and testified at trial. While Ms. Rogers' motives for testifying were vigorously challenged by the defense on cross-examination and in closing argument, *never* did Petitioner even attempt to rebut or refute Ms. Rogers' testimony regarding his incriminating statements, and her testimony stands uncontradicted.

We agree with the circuit court that, although Mr. Kopera's testimony connecting appellant to the gun used in the shooting was "helpful to the State, [it] was not central to the case."[6] Because Mr. Kopera's testimony was not critical to the case, and there was other compelling evidence of appellant's guilt, the circuit court did not abuse its discretion in deciding that the newly discovered evidence did not create a "substantial or significant possibility that the result may have been different."

**JUDGMENT AFFIRMED. COSTS TO BE PAID BY APPELLANT.**

---

[6] As indicated, appellant's girlfriend testified that, approximately one week before the shootings, appellant had fired a gun in the District of Columbia, and Mr. Kopera testified that the gun fired at American Mailbox was the same gun.