*Robert Anthony McGhie v. State of Maryland*, No. 78, September Term 2015

**CRIMINAL LAW — PETITION FOR WRIT OF ACTUAL INNOCENCE — IMPACT OF NEWLY DISCOVERED EVIDENCE —** When newly discovered evidence reveals that an expert witness testified falsely, the judge hearing a petition for actual innocence looks back to the trial that occurred to determine whether, had the jurors been made aware that the expert witness testified falsely about his academic credentials, the newly discovered evidence creates a substantial or significant possibility that the verdict may have been different. Md. Code Ann., Crim. Proc. § 8-301(a)(1) (2010, 2008 Repl. Vol., 2015 Supp.). That determination requires the hearing judge to consider the reasonable probability that, had the jurors known of the witness's lies, they would have discredited the balance of the expert witness's testimony. The judge then must consider the remaining evidence that was before the jury to determine whether the petitioner has carried the burden of proving that the newly discovered evidence created a "substantial or significant possibility that the result may have been different." Here, the judge neither erred nor abused his discretion in ruling that Petitioner did not carry that burden.

Circuit Court for Montgomery County
Case No. 71295
Argued: April 5, 2016

IN THE COURT OF APPEALS
OF MARYLAND

No. 78

September Term, 2015

---

ROBERT ANTHONY MCGHIE

v.

STATE OF MARYLAND

---

Barbera, C.J.,
*Battaglia
Greene
Adkins
McDonald
Watts
Raker, Irma (Retired,
Specially Assigned),

JJ.

---

Opinion by Barbera, C.J.
McDonald, J., concurs.
Raker, J., dissents.

---

Filed: August 24, 2016

*Battaglia, J., now retired, participated in the hearing and conference of the case while an active member of this Court. After being recalled pursuant to the Constitution, Article IV, Section 3A, she also participated in the decision and adoption of this opinion.

Maryland law affords persons convicted of certain crimes the chance to obtain a new trial based on "newly discovered evidence" that "creates a substantial or significant possibility" that the result of the trial would have been different. The vehicle for obtaining such relief is a Petition for Writ of Actual Innocence. *See* Md. Code Ann., Crim. Proc. § 8-301(a)(1) (2010, 2008 Repl. Vol., 2015 Supp.).[1] Petitioner Robert McGhie is serving a life sentence for murder and related offenses stemming from a 1994 failed armed robbery. In 2013, Petitioner filed a petition under § 8-301, basing it on newly discovered evidence that the State's ballistics expert, Joseph Kopera, testified falsely about his academic credentials at Petitioner's trial. Following a hearing on the petition, the Circuit Court for Montgomery County denied relief, concluding that Kopera's lies about his academic credentials did not create a substantial or significant possibility of a different outcome at trial. The Court of Special Appeals affirmed the judgment of the Circuit Court. *McGhie v. State*, 224 Md. App. 286, 288 (2015). We, in turn, affirm the judgment of the Court of Special Appeals.

## I.

### *The Trial and Appeal*

Petitioner was tried before a jury in the Circuit Court for Montgomery County. The State proceeded on charges of murder, attempted murder, two counts of use of a handgun during the commission of a crime of violence, and conspiracy to commit armed robbery. The target of the planned robbery was the American Mailbox, a business located in Silver

---

[1] All further statutory references are to the Criminal Procedure Article.

Spring, Maryland that provides mailing services to customers. Much of the State's evidence of Petitioner's involvement in the crimes was presented through the testimony of one of the co-conspirators to the robbery, Edward Borrero.

Borrero, sixteen years old at the time of trial, testified pursuant to a plea agreement.[2] His testimony was lengthy and detailed. According to Borrero, at 2:30 p.m. on January 31, 1994, he called a man known to him as "Mike."[3] After the call, Borrero and his friend, then-sixteen-year-old Terrance Robinson, went to Mike's apartment on 19th Street in Washington, D.C., arriving around 3:00 p.m. or sometime shortly thereafter. Mike talked with Borrero and Robinson about "a little store that [they] could hit." In discussing a plan for the robbery, Mike drew a blueprint of the American Mailbox and told the two teenagers that there was $40,000 to $80,000 in cash in the back office.

Petitioner arrived at the apartment a few minutes later. Shortly thereafter, he, Mike, Borrero, and Robinson drove in a Chevrolet Celebrity ("the Celebrity") to an apartment where Mike retrieved a 9-millimeter chrome handgun. Mike then returned to the car, accompanied by his girlfriend, Angie. An acquaintance of Mike, Earl ("Skinny") Patterson, was waiting together with the others. Mike handed Borrero the handgun, and Skinny gave Borrero the keys to a Chrysler New Yorker ("the New Yorker").

---

[2] Under the terms of that agreement, Borrero pleaded guilty to six charges, including first-degree murder, in exchange for the State's recommendation of a life sentence with, rather than without, the possibility of parole.

[3] Mike's full name is Frederick DeSuzar. We refer to him as "Mike," as that is how he is referred to throughout the record.

With Borrero driving the New Yorker, and Petitioner, Mike, Angie, and Robinson in the Celebrity, the group traveled in the direction of the American Mailbox. The trip was interrupted by a detour to take Angie back to the apartment, as she had decided not to participate in the planned robbery. After dropping her off, Borrero joined Petitioner, Mike, and Robinson in the Celebrity. They drove together to view the exterior of the American Mailbox and discuss the robbery plan. Once the plan was set, the four men retrieved the New Yorker.

The four men then drove separately in the two cars to the apartment of Vanessa Hood. There, Mike collected a .38 revolver and handed it to Borrero. Borrero opted to use the chrome pistol and passed the revolver to Robinson. Borrero and Robinson then drove the Celebrity to the American Mailbox, while Mike and Petitioner drove the New Yorker to a spot a few blocks from the store.

Borrero and Robinson entered the American Mailbox. Borrero, with a book of stamps in hand, approached the counter where the storekeeper, Joseph Atkins, was speaking on the telephone. When the call ended, Borrero pulled out a gun. Atkins reached across the counter to defend himself, and Borrero shot him in the face.

Borrero and Robinson then searched, without success, for the money. As they were doing that, a storekeeper from down the street, Randall Covington, entered the American Mailbox. Borrero shot him as well. Covington died of the gunshot wound.

Borrero and Robinson fled the store and drove in the Celebrity to meet Mike and Petitioner, who were waiting in the New Yorker. The four abandoned the Celebrity on the street and drove in the New Yorker to Hood's apartment. At the apartment, Mike left the

3

two guns with Hood.  About ten minutes after their arrival, a young man, later determined to be Hood's son, Vandell Roseman, entered the apartment.  Soon thereafter, Petitioner, Mike, and Roseman left the apartment.  Borrero and Robinson remained at the apartment watching television, then left after seeing a news report about the shooting.

Borrero further testified that he was arrested on February 8, 1994, and at that time told a different story to the police.  In that interview, he reversed Mike's and Petitioner's participation in the crime and reversed his role with that of Robinson.

The State called Hood and her son, Roseman, each of whom corroborated aspects of Borrero's testimony.  Hood testified that, on January 31, 1994, around 3:30 p.m. to 4:00 p.m., Petitioner and Mike came to her apartment, which is about a fifteen-minute drive from the American Mailbox, to collect a gun that Mike had left there.  The gun was brown and black and had a cylinder in the middle.  About thirty to forty-five minutes later, Petitioner and Mike returned to her house with two boys.  Hood testified that they must have arrived sometime before 5:00 p.m. because she was watching the Oprah Winfrey show, which airs from 4:00 p.m. to 5:00 p.m.  Mike gave her two guns and asked her to keep them; one gun was the brown and black gun that Mike had picked up earlier that afternoon and the other gun was flat and silver.  Ten to fifteen minutes later, Roseman came home but left sometime thereafter.  Like Borrero, Hood testified that the two boys were watching television at Hood's apartment for a time but left after they watched a news report about a shooting nearby.  About two to three days after the incident, Hood decided that she did not want the guns in her home and gave them to Roseman to discard.

Roseman testified that, on January 31, 1994, he came home around 5:00 or 6:00 in

4

the evening and saw Petitioner, Mike, and two boys. At Petitioner's request, Roseman drove him to the American Mailbox. When upon arrival they saw that police were surrounding the area, Petitioner told Roseman to "forget it and just to go back home." Roseman's mother instructed him a couple of days later to discard two handguns, a silver automatic and a black and brown revolver. He threw the guns into a trash can.

Barbara Rogers resides at the apartment on 19th Street where Borrero and Robinson had met with Mike earlier on January 31, 1994, to discuss the robbery plan. Rogers testified that, towards the end of 1993, she allowed Mike and Petitioner to move into her apartment; Petitioner left after a short stay and, in January 1994, Rogers asked Mike to leave. Mike came to her apartment on January 31, 1994, to pick up his belongings. Petitioner arrived sometime after 2:00 p.m. and, thereafter, he and Mike "were in and out" of the apartment. Rogers overheard Mike say that there was a "sweet spot" that had $80,000, to which Petitioner responded, "[l]et's take the motherfucking joint." Mike said that he "would never have to hustle again" and would take his share and return to Jamaica. Petitioner said that he was going to buy a nice car. Borrero called Rogers's apartment that same afternoon to speak to Mike. About thirty to forty-five minutes later, Borrero and Robinson arrived at her apartment. Rogers believed that all four left sometime before 3:00 p.m.

Rogers further testified that, a couple of days later, Petitioner and Mike were in her apartment and she again heard them talking about the robbery. Rogers testified that she overheard Petitioner say that "his fingerprints ain't on nothing and didn't nobody see him nowhere near the place." She also heard Petitioner say that "a man dead and we didn't get

5

a damn dime." Rogers also testified that in early 1994 she helped the Montgomery County Police Department identify persons involved in the crime and received $820 and additional money to pay her telephone bill. She also admitted that she was negotiating a bad checks case with the U.S. Attorney, stating, though, that her case had nothing to do with her testimony and she did not receive any financial assistance or leniency in that federal case for her testimony as a witness against Petitioner.

Atkins, the American Mailbox storekeeper, survived the shooting and testified about the incident. On that day, two kids came into the store. After one kid made a purchase, Atkins handed him his change and the receipt; the kid then pulled out a dark grey gun and shot Atkins in the mouth. The kid shooter then looked for money while the other kid stood there. When Covington, the storekeeper from down the street, entered the store, the kid who shot Atkins also shot Covington. That same kid then stood over Atkins and shot him again; Atkins had his hands over his head and the bullet went through his arm. Atkins had identified Borrero before trial as the shooter and confirmed that identification at trial. Atkins also identified the receipt for the attempted robbers' purchase that had been left behind. The receipt was dated January 31, 1994, with a time of 4:39 p.m.

Three Montgomery County Police Department officers testified about the crime scene, the arrest of Petitioner, and the Celebrity—the car that had been abandoned a few blocks from the American Mailbox. In addition, Charles Felker, a latent fingerprint examiner for Montgomery County Police Department admitted as an expert in fingerprint identification, testified that he found Borrero's prints on the driver's side of the Celebrity and Petitioner's and Mike's fingerprints on the New Yorker.

6

As further support of its theory that Petitioner participated in the crime, the State called Joseph Kopera, a ballistics expert, to testify that a bullet and shell casings found at the American Mailbox crime scene matched bullets and shell casings from an unrelated shooting incident on January 23, 1994, involving Petitioner. Kopera testified that he worked for the Maryland State Police Ballistics Laboratory, a position he held for the past three years and, for twenty-two years before that, he worked at the Baltimore City Crime Lab in the Ballistics Unit. He added that he worked long hours, testified about 125 to 130 times a year, and conducted around 1,200 to 1,400 examinations a year. He explained that the ballistics field entails identification of firearms, projectiles, and cartridge cases. He stated that he had testified in jurisdictions across Maryland, in other state courts in the mid-Atlantic region, and in the federal courts.

Pertinent here, Kopera testified about his credentials as follows:

> There are no colleges or universities that offer a degree in the field specifically of ballistics or firearms identification, so all knowledge of the field is done by way of on-the-job training. I spent a tenure of five years on-the-job training with the FBI and also with the Baltimore City Firearms Laboratory before becoming court-qualified. Before this training, we must fit the qualifications as far as educational background to get into the field. The State Police and also the Baltimore City Crime Lab and the FBI require a science-related degree in a field relative – in an area relative to your field. I hope [sic] a degree in engineering from the University of Maryland here in the State of Maryland and also an engineering degree from the Rochester Institute of Technology in the state of New York. I am a graduate of the FBI Academy in the fields of ballistics. I am on the board of directors for the Association of Firearm and Tool Mark Examiners, which is the governing agency of firearms experts here in the United States and many countries abroad.

The trial court admitted Kopera as an expert in ballistics identification.

Kopera testified that he examined two 9-millimeter bullets and three casings

7

recovered from the unrelated January 23rd shooting and one 9-millimeter bullet and three casings from the American Mailbox crime scene. Kopera concluded that the bullets and casings from both scenes were fired from the same gun. He further opined to a reasonable degree of scientific probability that the firearm used in both shootings was a semi-automatic pistol.

In support of Petitioner's involvement in the January 23rd incident, the State presented three witnesses to the shooting on that day. All three testified that they saw Petitioner shoot a gun while hanging out with Mike.

Petitioner testified that he was not involved in the planning or commission of the failed armed robbery. According to Petitioner, a couple of days before the crime, he traded the New Yorker for Skinny's Celebrity. Then, on January 31, 1994, he was driving the Celebrity "up Georgia Avenue." He testified: "I stopped [the] car to go into a store to buy something to eat . . . . I left the ignition running to go and purchase something. By the time I returned to the car, the car was not there." Petitioner added that the car was stolen sometime between 3:00 p.m. and 4:00 p.m., or as early as 2:30 p.m. Petitioner then called Mike so that Mike could contact Skinny to inform him that the car had been stolen. Petitioner found the New Yorker parked nearby and, having a set of keys to that car on his person that day, began driving that vehicle. In response to the court's questioning how he knew the New Yorker was only a few blocks away from where the Celebrity was stolen, Petitioner said, "I guess I had drove by and seen it there. I'm not quite sure, but I know it was there." Petitioner testified that, once in possession of the New Yorker, he picked up Mike. The two went to Skinny's girlfriend's house to let her know that the Celebrity had

8

been stolen. Petitioner and Mike then drove to Mike's daughter's house in Maryland; he was there "around 4:30 to 5:00," and then "was just basically driving around basically for the rest of the evening."

Petitioner was questioned on cross-examination about a signed statement he had made to police that was not completely consistent with his testimony on direct examination. In that statement, Petitioner had told the police that, between 3:00 p.m. and 4:00 p.m. on the day of the crime, he was with Mike at a McDonald's on Georgia Avenue and that he gave the Celebrity to a girl who was with Skinny. When questioned at trial why he did not tell the police that the Celebrity had been stolen, Petitioner testified that he had not wanted to tell the police that he had been driving that car while his license was suspended.

During closing arguments, the State emphasized that the case rested upon accomplice liability and that, because Petitioner was a co-conspirator to the planned armed robbery, he was guilty of the crimes committed in furtherance of the conspiracy. The State pointed out that Petitioner could not keep his story straight while testifying; moreover, his own words "place[d] him with Mike at the time of the murder." The State recapped the testimony that linked Petitioner to Mike and the murder weapon and, in that regard, referred to the ballistics testimony of Kopera. The State emphasized that the timing of events in the case was crucial and that the testimony of Vanessa Hood, her son, Vandell Roseman, and Barbara Rogers each, standing alone, corroborated aspects of Borrero's testimony.

The jury found Petitioner guilty on all counts. The judgment was affirmed by the Court of Special Appeals in an unreported opinion.

9

On May 16, 2013, Petitioner filed a petition for writ of actual innocence. Petitioner alleged that, at his trial, Kopera lied to the jury by testifying that he earned engineering degrees from Rochester Institute of Technology and the University of Maryland and graduated from the FBI Academy in the field of ballistics. Petitioner stated that, on December 15, 2011, he received a cover letter from an Assistant State's Attorney enclosing a letter to her, dated March 8, 2007, from Colonel Thomas E. Hutchins, Secretary of the Maryland State Police. Colonel Hutchins's letter addressed the discovery of discrepancies concerning Kopera's education. Petitioner attached those two letters to his petition along with two newspaper articles reporting that state police investigators had confirmed that Kopera did not earn degrees from Rochester Institute of Technology or the University of Maryland and that Kopera provided a forged college transcript from the University of Maryland to an attorney who confronted him about the discrepancies. Petitioner also attached an affidavit of William E. Conrad, Forensic Firearms Consultant, which had been filed in a separate, unrelated case in which Kopera had testified. Conrad expressed concern with Kopera's alleged qualifications because Kopera had stated that he graduated from the "F.B.I. Academy in the field of firearms identification and gunpowder residues"; yet, no such educational course had been offered.

Petitioner argued that Kopera's false testimony about his academic credentials rendered his remaining testimony unreliable. Moreover, "without the contested ballistics results and perjured testimony" from Kopera, there is a "substantial or significant possibility that the result may have been different." The State opposed the petition but

conceded that Kopera had lied about his credentials. The State argued, among other things, that the claim was waived because a competent defense attorney would have discovered Kopera's falsehoods in time to file a motion for new trial and, even so, there was "no significant possibility that the outcome of the proceedings in McGhie's case would have been different had counsel discovered the falsification of credentials by Mr. Kopera."

The Honorable Robert Greenberg ("the hearing judge") presided over the hearing on the petition and denied it in a written opinion and order. The hearing judge rejected the State's assertion that Petitioner had waived his claim. The judge explained that Kopera's false testimony could not have been discovered by defense counsel's exercise of due diligence:

> There is no evidence that was presented to this court to demonstrate that Kopera was exaggerating his qualifications prior to Petitioner's trial in 1994. Apparently, no red flags had been raised from Kopera's testimony in other cases that would require a competent defense attorney to question Kopera's pedigree, collegiate record, or the like.
> . . . To hold defense counsel to the requirement of a background check of an expert who had testified in scores of cases is unrealistic. Indeed, the State – which should bear some responsibility for its own expert's mendacity – was likewise in the dark about the situation. Why should a greater burden devolve upon the defense?

Turning to whether Petitioner had proved his entitlement to a new trial based on the newly discovered evidence, the hearing judge noted the absence of a provision in § 8-301 or case law explaining the analysis a court should employ when considering the impact of such evidence. The hearing judge pondered whether a court should "simply excise the false testimony and then, based on the remaining evidence, determine whether the result would have been different" or "consider whether the result would have been different if it was

11

revealed during the trial that Kopera's educational qualifications were exaggerated."

The hearing judge concluded that the first of the two standards—excision of the false testimony—is the correct standard and, applying that standard, determined that there was no possibility that the verdict would have been different without Kopera's testimony about his education.[4] The hearing judge concluded that the "jury would not have been influenced in any way – much less substantially or significantly – by the lack of testimony concerning Kopera's college education." The judge further reasoned that Kopera's testimony, to which the State during closing argument relied "only in passing" and the defense counsel not at all, "while helpful to the State, was not central to the case."

The hearing judge also considered Petitioner's claim under the alternative analysis—had the jury known of Kopera's perjured testimony—and concluded that the verdict would not have been affected even under that alternative because "[t]here was ample testimony directly implicating Petitioner in the murder, aside from ballistics evidence." The hearing judge highlighted the testimony of Borrero, Hood, Roseman, and

---

[4] The hearing judge derived that analysis from *Kulbicki v. State*, 207 Md. App. 412, 447 (2012), *rev'd on other grounds*, 440 Md. 33 (2014), *rev'd*, 136 S. Ct. 2, *aff'd*, 445 Md. 451 (2015). *Kulbicki* was a postconviction case in which Kulbicki had argued, among other claims, that Kopera's false testimony about his credentials at Kulbicki's trial violated his due process entitlement to a fair trial. 207 Md. App. at 443. The Court of Special Appeals agreed with and affirmed the postconviction judge's decision to excise only the false testimony. The court also agreed with the judge's ultimate ruling that "there simply is no likelihood that the jury's determination would have been influenced by the fact that Mr. Kopera did not have the academic credentials he claimed" because "the record reflected that ballistics is a field for which no college degree is offered, and the expertise for the field is usually based on experience, which Kopera had in copious amounts." *Id*. at 447. This aspect of the Court of Special Appeals's opinion in *Kulbicki* was not the subject of the subsequent opinions of this Court or the United States Supreme Court.

Rogers. The judge noted, in that analysis, that Petitioner testified in his defense but never refuted Rogers's testimony, thereby leaving her testimony about his incriminating statements "uncontradicted."

The Court of Special Appeals affirmed, for all the same reasons, the hearing judge's denial of Petitioner's petition for writ of actual innocence. *McGhie*, 224 Md. App. at 288.

We granted Petitioner's petition for writ of certiorari to answer two questions, which we have reworded:

1. When ruling on a petition for writ of actual innocence, how should a circuit court apply newly discovered evidence that an expert witness lied about his academic credentials to determine if that evidence creates a substantial or significant possibility that the result may have been different?

2. Did the hearing judge err or abuse his discretion in denying Petitioner's petition for writ of actual innocence?

II.

The two questions before us, reduced to their essence, ask if the hearing judge committed legal error or abused his discretion in deciding that Petitioner was not entitled to relief under § 8-301. To answer both questions we look first to the language of § 8-301, in particular, subsections (a) and (g):

(a) A person charged by indictment or criminal information with a crime triable in circuit court and convicted of that crime may, at any time, file a petition for writ of actual innocence in the circuit court for the county in which the conviction was imposed if the person claims that there is newly discovered evidence that:
(1) creates a substantial or significant possibility that the result may have been different, as that standard has been judicially determined; and
(2) could not have been discovered in time to move for a new trial

13

under Maryland Rule 4-331.[5]

. . .

(g) A petitioner in a proceeding under this section has the burden of proof.

*See also* Md. Rule 4-332.[6]

---

[5] Rule 4-331 provides in relevant part:
> (a) Within ten days of verdict. On motion of the defendant filed within ten days after a verdict, the court, in the interest of justice, may order a new trial.
> . . .
> (c) Newly discovered evidence. The court may grant a new trial or other appropriate relief on the ground of newly discovered evidence which could not have been discovered by due diligence in time to move for a new trial pursuant to section (a) of this Rule:
> > (1) on motion filed within one year after the later of (A) the date the court imposed sentence or (B) the date the court received a mandate issued by the final appellate court to consider a direct appeal from the judgment or a belated appeal permitted as post conviction relief[.]

[6] We promulgated Maryland Rule 4-332 to elaborate on the procedures for filing a petition for writ of actual innocence. Subsection (d)(9) provides, among other pleading requirements, "that the conviction sought to be vacated is based on an offense that the petitioner did not commit[.]" At oral argument before this Court, counsel for both parties were questioned about whether the petition failed to comply with Rule 4-332(d)(9) because the petition does not contain an express averment "that the conviction sought to be vacated is based on an offense that the petitioner did not commit."

We recognized in *State v. Hunt*, 443 Md. 238, 255-56 (2015), that the petition of one of the two petitioners in that case, Hardy, did not comply with some of the technical requirements of Rule 4-332(d). Nevertheless, we concluded that Hardy's petition satisfied the pleading requirements, *id.* at 264, because the circuit court had not dismissed his petition for failing to comply substantially with the pleading requirements, *id.* at 255-56. We pointed out that Rule 4-332(i)(1) provides a "relief valve" from dismissal of the petition, in which dismissal is not required if it is determined that the petition substantially complies with the requirements of subsection (d). *Id.*

Rule 4-332(i)(1) provides that,
[u]pon consideration of the petition and the State's response, the court may (A) dismiss the petition if it finds as a matter of law that the petition fails to comply substantially with the requirements of section (d) of this Rule or otherwise fails to assert grounds on which relief may be granted or (B) grant leave to amend the petition to correct the deficiency[.]

The record makes plain that Petitioner had testified at trial to his actual innocence of the charged crimes. The State has not moved to dismiss the petition for lack of an averment of innocence and, in response to this Court's questions at oral argument, had no quarrel with the adequacy of the petition. Moreover, the hearing judge evidently did not

We bear in mind that "'decisions on the merits of requests for new trials based on newly discovered evidence, whether filed pursuant to Rule 4-331 or [§ 8-301], are committed to the hearing court's sound discretion.'" *State v. Hunt*, 443 Md. 238, 257 (2015) (quoting *Douglas v. State*, 423 Md. 156, 188 (2011)). We, however, do not leave to the hearing judge's discretion the resolution of purely legal questions. *Id.* at 247.

Petitioner argues that the hearing judge erred or abused his discretion in ruling ultimately that Petitioner had not carried his burden to establish his entitlement to relief of a new trial on the ground that the newly discovered evidence of Kopera's false testimony about his academic credentials created a substantial or significant possibility that the result may have been different. The State does not contest the hearing judge's threshold determination that the evidence of Kopera's lies about his academic credentials was "newly discovered." The State, not surprisingly, further agrees with the hearing judge's ultimate determination that Petitioner did not prove his entitlement to the relief of a new trial on the basis of Kopera's false testimony about his academic qualifications. The parties do not dispute that the substantial or significant possibility standard "falls between 'probable,' which is less demanding than 'beyond a reasonable doubt,' and 'might' which is less stringent than probable." *Yorke v. State*, 315 Md. 578, 588 (1989); *see also Yonga v. State*, 446 Md. 183, 210-11 (2016) (describing the Rule 4-331 standard as the "bedrock" and

---

recognize any problem in this regard and proceeded to conduct a hearing on the merits of the petition. Under these circumstances, and detecting no jurisdictional concern with the lack of an averment of innocence, we have no just reason to direct a dismissal of the petition.

15

"foundation" of § 8-301).

Although the parties agree on the proper standard, they would have us employ different analyses in its application. The State proposes that we adopt a novel approach to determining whether a petitioner seeking relief under § 8-301 is entitled to a new trial based on newly discovered evidence that a State's expert witness testified falsely about his credentials. The State urges adoption of a "prospective" analysis, under which the hearing judge and any reviewing court hypothesize whether a *new* trial without the expert witness's perjured testimony would result in a verdict different from that reached at the actual trial. The State argues that a retrospective approach—one that looks back to the petitioner's trial to determine the impact the new evidence would have had on the result—is illogical because it assumes that the "prosecutor would knowingly present false testimony from its experts." Petitioner takes exception to the State's proposal and argues that the plain language of § 8-301(a)(1) requires a retrospective approach that considers the impact of the newly discovered evidence at the trial that occurred.

We agree with Petitioner. By its past tense choice of the text, the General Assembly made plain that § 8-301(a)(1) requires courts to look back to the trial that occurred to determine whether the newly discovered evidence "creates a substantial or significant possibility that the result *may have been* different[.]" (Emphasis added). *See also Hunt*, 443 Md. at 264 (explaining that "the Circuit Court must determine whether the new evidence regarding Kopera creates a substantial or significant possibility that the *result of their trials may have been different*" (emphasis added)). In this case, the hearing judge properly "looked back" to what occurred at Petitioner's trial to decide whether he had

16

proved his entitlement to relief.

The parties' disagreement does not end there, as each takes issue with the other's view of how to apply the "looking back" approach. The State asserts that when, as here, the newly discovered evidence is that a State's expert witness testified falsely at the trial, the hearing judge need only excise the false testimony and then determine from the remaining evidence whether there is a substantial or significant possibility that the result at trial may have been different. Petitioner counters that the hearing judge must decide whether, had the jurors been aware of the falsehood, there is a substantial or significant possibility that the result of the trial may have been different.

Again we agree with Petitioner. The appropriate analysis is not simply to excise the falsehood, for such an approach, as applied to this case, ignores the "substantial or significant possibility" that one or more of the jurors at Petitioner's trial, had they known of Kopera's false testimony about his credentials, would have discredited his testimony in its entirety.[7] *See State v. Plude*, 750 N.W.2d 42, 56 (Wis. 2008) (concluding that where an expert witness lied about his credentials, the reliability of the expert's substantive testimony may have been affected). We spoke of this possibility in *Hunt*, 443 Md. at 263-64.

In *Hunt*, we declared as "overly rigid" the distinction the Court of Special Appeals

---

[7] The State does not appear to contest the "materiality" of Kopera's false testimony about his academic credentials, and the hearing judge made no finding that Kopera's false testimony was immaterial. We therefore proceed to the ultimate question for decision: whether the hearing judge erred or abused his discretion in ruling that Petitioner had not proved his entitlement to a new trial.

17

identified in *Jackson v. State*, 216 Md. App. 347, 367, *cert. denied*, 438 Md. 740 (2014), between "impeaching" evidence, i.e., evidence that a witness lied about the merits of the case, and so-called "merely impeaching" evidence, i.e., false testimony concerning the witness's credibility. 443 Md. at 263-64. Pertinent here, we observed in *Hunt* that, "[w]hen an expert is called to testify, it is conceivable that, based on the cumulative body of evidence presented at a given trial, falsity regarding the expert's credibility and qualifications might 'create[] a substantial or significant possibility that the result may have been different.'" *Id*. at 264 (alteration in original) (quoting § 8-301(a)(1)). We adopt here the *Hunt* dicta and apply it to the case before us. If the jury is made aware that the expert lied about his qualifications, the jury might also reasonably find that other aspects of the expert's testimony are not reliable.[8]

The hearing judge correctly addressed the petition, albeit as an alternative, by considering whether there was a substantial or significant possibility that, had the jury known of Kopera's lies about his academic credentials, the jury would have discounted his testimony in its entirety. With that ballistics testimony out of the equation, the judge considered the other evidence that was presented to the jury and concluded that he "cannot find that the verdict would have been different":

> There was ample testimony directly implicating Petitioner in the murder, aside from ballistics evidence. Vanessa Hood testified that Petitioner and his three co-conspirators came to her home the afternoon after the murder, leaving two handguns on her bed. Petitioner and another had visited earlier

---

[8] We do not agree with Petitioner that there is a substantial or significant possibility that, if armed with the knowledge that one of the State's witnesses, Kopera, lied, the jurors reasonably would have distrusted the credibility of the other witnesses the State presented to trial.

in the day to pick up one of the weapons.

During this time, a news bulletin was broadcast on the television which described the murder. Ms. Hood's son, Vandell Roseman, testified that Petitioner had him drive past the scene of the shootings that same afternoon, presumably to see what investigation was taking place, and perhaps to see what had become of the abandoned automobile that transported the conspirators to the murder scene. Roseman later disposed of the two guns, at his mother's request. Petitioner told Roseman, after cruising by the murder scene, to "forget it and just go back home."

Edward Borrero, who shot the murder victim, testified to Petitioner's presence during the planning stage of the crime and during the getaway. . . .

Barbara Rogers heard Petitioner discussing the crime before its consummation, telling a confederate, "Let's take the motherfucking joint." He said he was going to get a nice car with his share of the money, thought to be $80,000.00, that would be the fruit of the intended robbery. After the crime, she heard him lament that a man was dead, and that Petitioner "didn't get a damn dime." He also was apparently heartened by the fact that his fingerprints were nowhere to be found at the crime scene.

Of special significance, Petitioner took the witness stand and testified at trial. While Ms. Rogers' motives for testifying were vigorously challenged by the defense on cross-examination and in closing argument, *never* did Petitioner even attempt to rebut or refute Ms. Rogers' testimony regarding his incriminating statements, and her testimony stands uncontradicted.

It is important to note that the hearing judge made no mention of the three witnesses who testified that Petitioner shot a gun in an unrelated incident on January 23, 1994. We assume that the hearing judge understood that the testimony of those lay witnesses had to be discounted, along with Kopera's ballistics testimony, as the jury would not have heard the testimony of the lay witnesses save for Kopera's testimony linking that gun to the crime at issue. The hearing judge correctly eliminated that lay witness testimony from his analysis.

We discern no legal error or abuse of discretion on the part of the hearing judge in properly analyzing the petition by recognizing the reasonable possibility that the jury, aware of Kopera's lies about his academic credentials, would have discounted his

19

testimony on the merits, as well as the lay witness testimony that followed from it. Neither did the hearing judge abuse his discretion in ruling, in the end, that, given the weight of the evidence presented against him at trial, Petitioner was unable to prove that Kopera's lies "create[d] a substantial or significant possibility that the result may have been different." We therefore affirm the judgment of the Court of Special Appeals.

> **JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS TO BE PAID BY PETITIONER.**

Circuit Court for Montgomery County
Case No.: 71295-C
Argued: April 5, 2016

IN THE COURT OF APPEALS OF
MARYLAND

No. 78

September Term, 2015

ROBERT ANTHONY MCGHIE

v.

STATE OF MARYLAND

Barbera, C.J.,
*Battaglia
Greene
Adkins
McDonald
Watts
Raker, Irma S.
    (Retired, specially assigned),

JJ.

Concurring Opinion by McDonald, J.

Filed:  August 24, 2016

*Battaglia, J., now retired, participated in the
hearing and conference of the case while an
active member of this Court; after being recalled
pursuant to the Constitution, Article IV, Section
3A, she also participated in the decision and
adoption of this opinion.

I agree with the Majority opinion's disposition of this particular case. But I also agree with most of Judge Raker's scholarly analysis of the statute that created the writ of actual innocence – Maryland Code, Criminal Procedure Article ("CP"), §8-301– and the rule that implements it – Maryland Rule 4-332.

I agree with Judge Raker that CP §8-301was created to exonerate the truly innocent, no matter how late that proof may become available, and not simply to override the time limits of Rule 4-331. For that reason, a petitioner's assertion of actual innocence, as required in Rule 4-332(d)(9), is a critical prerequisite.

In this case, Mr. McGhie did not include the required allegation of actual innocence in his petition. Indeed, the petition is bereft of any reference to Rule 4-332. In most cases, in my view, that should result in dismissal of the petition. However, it is also the case that (1) Mr. McGhie testified under oath at trial that he did not commit the offense and (2) the State did not object to his failure to reiterate that assertion in his petition for a writ of actual innocence. In those circumstances, in my view, it is not inappropriate to reach the merits, as the Majority opinion does, on the theory of substantial compliance. In the absence of either of those circumstances – *i.e.*, had Mr. McGhie not already asserted under oath that he is innocent of the offense or had the State objected to his failure to make that averment in his petition – I would hold that a petition that fails to comply with Rule 4-332(d)(9) should be dismissed.

Circuit Court for Montgomery County
Case No.: 71295-C
Argued: April 5, 2016

IN THE COURT OF APPEALS OF
MARYLAND

No. 78

September Term, 2015

ROBERT ANTHONY MCGHIE

v.

STATE OF MARYLAND

Barbera, C.J.,
*Battaglia
Greene
Adkins
McDonald
Watts
Raker, Irma S.
    (Retired, Specially Assigned),

JJ.

Dissenting Opinion by Raker, J.

Filed: August 24, 2016

*Battaglia, J., now retired, participated in the
hearing and conference of the case while an
active member of this Court; after being recalled
pursuant to the Constitution, Article IV, Section
3A, she also participated in the decision and
adoption of this opinion.

I respectfully dissent. The Court should dismiss the petition because petitioner did not satisfy the requirements of Maryland Rule 4-332, Writ of Actual Innocence. The Rule requires that the petition "shall state . . . (9) that the conviction sought to be vacated is based on an offense that the petitioner did not commit." *See Maryland Rule* 4-322 (d). Petitioner did not include the required allegation in his petition, and his failure to allege actual innocence should be fatal to his petition. The petition should be dismissed.

If I were to reach the merits, I would agree with result the majority reaches. In my view, however, the title, purpose, history, and position of § 8-301 of the Criminal Procedure Article, Md. Code Ann. (2010, 2008 Repl. Vol., 2015 Supp.), within a broader statutory scheme, demonstrates that a petitioner for a writ of actual innocence must plead actual innocence in order to maintain an action under § 8-301, and this requirement, although set out in the Rule and not the statute, may not be waived by a State's Attorney or Attorney General. *See* Md. Rule 4-332(d)(9) (requiring petition to state that the conviction is "based on an offense that the petitioner did not commit"). Without this basic requirement, we would read § 8-301 to abrogate Maryland Rule 4-331(c)—and in the process unseal Pandora's box, releasing a litany of claims not premised on actual innocence. I do not believe that this was the Legislature's intent when it enacted § 8-301. Because the petitioner in this case failed to plead that he did not commit the crimes upon which he was convicted,[1] and for the reasons

---

[1]The Court justifies reaching the merits on two grounds: (1) that the State did not move to dismiss the petition for lack of averment of actual innocence, and the hearing judge did not recognize any problem in the pleading, and (2) presumably the petition "substantially complie[d] with the requirements of subsection (d)." I do not believe that either basis
(continued...)

that follow, I would vacate the judgment of the Court of Special Appeals and remand the case to the Circuit Court for Montgomery County with instructions to dismiss the petition.

The cardinal rule of statutory construction is that courts must (1) consider the object or purpose to be attained by the statute and the "evils or mischief" sought to be remedied, and (2) construe the statute in a manner that effectuates the purpose, suppresses the mischief, and aids in the remedy. *Johnson v. State*, 75 Md. App. 621, 542 A.2d 429 (1988); *see also Mayor & Council of Rockville v. Rylyns Enters., Inc.*, 372 Md. 514, 814 A.2d 469 (2002) (explaining that statutes must be construed "as a whole, and as part of the larger statutory scheme"). It is axiomatic that our construction of a statute should not "defeat or frustrate the legislative intention." *Criminal Injuries Comp. Bd. v. Gould*, 273 Md. 486, 494, 331 A.2d 55, 61 (1975). Naturally, when divining legislative intent, we start with the very words of the statute under consideration—but that is not always where the analysis ends. When the words of the statute do not adequately supply the legislative intent, "we look to other indicia of that intent, including the title to the bill, the structure of the statute, the inter-relationship of its various provisions, its legislative history, its general purpose, and the relative rationality and legal effect of various competing constructions." *Baltimore Cty. v. RTKL Associates Inc.*, 380 Md. 670, 678, 846 A.2d 433, 437-38 (2004) (citations omitted).

---

[1](...continued)
justifies reaching the merits. First, in inverse order, the petition in no way substantially complies with the requirements of Rule 4-332. The core of the Rule is that petitioner did not commit the offense. Second, in my view, as addressed above, neither the State, the Attorney General nor the trial judge can waive that requirement.

The text of § 8-301 does little to illuminate the legislative intent behind its enactment. The statute provides, in relevant part:

> "(a) A person charged by indictment or criminal information with a crime triable in circuit court and convicted of that crime may, at any time, file a petition for writ of actual innocence in the circuit court for the county in which the conviction was imposed if the person claims that there is newly discovered evidence that:
>
> > (1) creates a substantial or significant possibility that the result may have been different, as that standard has been judicially determined; and
> >
> > (2) could not have been discovered in time to move for a new trial under Maryland Rule 4-331."

It is clear that § 8-301 (1) provides an avenue of judicial review for convicted persons who have newly discovered evidence that meets the conditions of § 8-301(a), and (2) gives the circuit courts power to provide various forms of relief. *See* Crim. Proc. § 8-301(f)(1) (permitting a circuit court to "set aside the verdict, resentence, grant a new trial, or correct the sentence, as the court considers appropriate"). Although the text of the statute refers to "actual innocence," the legislative intent behind its enactment, from the words of the statute alone, is less clear. At oral argument, the State—while acknowledging its ignorance of the provision's legislative history—contended that § 8-301 was meant to eliminate the time bar set out in Rule 4-331 and that failure to plead actual innocence is not "fatal" to the cause of action. Rule 4-331, Motions for new trial; revisory power, provides, in pertinent part, as follows:

"(a) Within Ten Days of Verdict. On motion of the defendant filed within ten days after a verdict, the court, in the interest of justice, may order a new trial.

(b) Revisory Power.
    (1) Generally. The court has revisory power and control over the judgment to set aside an unjust or improper verdict and grant a new trial:
        (A) in the District Court, on motion filed within 90 days after its imposition of sentence if an appeal has not been perfected;
        (B) in the circuit courts, on motion filed within 90 days after its imposition of sentence. Thereafter, the court has revisory power and control over the judgment in case of fraud, mistake, or irregularity.
    (2) Act of Prostitution While Under Duress. On motion filed pursuant to Code, Criminal Procedure Article, § 8-302, the court has revisory power and control over a judgment of conviction of prostitution to vacate the judgment, modify the sentence, or grant a new trial.

(c) Newly Discovered Evidence. The court may grant a new trial or other appropriate relief on the ground of newly discovered evidence which could not have been discovered by due diligence in time to move for a new trial pursuant to section (a) of this Rule:
    (1) on motion filed within one year after the later of (A) the date the court imposed sentence or (B) the date the court received a mandate issued by the final appellate court to consider a direct appeal from the judgment or a belated appeal permitted as post conviction relief; and
    (2) on motion filed at any time if the motion is based on DNA identification testing not subject to the procedures of Code, Criminal Procedure Article, § 8-201 or other generally accepted scientific techniques the results of which, if proved, would show that the defendant is innocent of the crime of which the defendant was convicted."

Beyond the one year limitation, the court has no subject matter jurisdiction to entertain a motion for new trial.

The State's construction of § 8-301 is simply untenable. To follow this argument to its logical conclusion, we would have to construe § 8-301 as gutting completely the time limits imposed wisely by Rule 4-331 for motions for new trial. The Court's expansive reading of Rule 4-332 writ of actual innocence makes Rule 4-331 superfluous. I do not think that the Legislature enacted § 8-301 to abrogate the limitation period of Rule 4-331 for *all* motions for new trial premised on newly discovered evidence, but rather to provide a narrow sliver of daylight only for motions premised on newly discovered (non-DNA) evidence that supports a claim of factual innocence.

A contrary reading of the statute would eviscerate the policies of judicial efficiency and finality of judgments in at least two ways. First, "broadening . . . the scope of the writ create[s] the risk that repetitious filings by individual petitioners might adversely affect the administration of justice" in the courts. *Schlup v. Delo*, 513 U.S. 298, 318 (1995); *see also* Paul M. Bator, *Finality in Criminal Law and Federal Habeas Corpus for State Prisoners*, 76 Harv. L. Rev. 441, 451 (1963). Second, opening the door to *all* motions for new trial premised on newly discovered evidence is not desirable because of the possibility of stale, missing, or degraded evidence, which would impair the State's ability to conduct a new trial. *See* Meghan J. Ryan, *Finality and Rehabilitation*, 4 Wake Forest J.L. & Pol'y 121, 123-25

(2014). There simply is no proof that the Legislature intended such drastic effects when it passed § 8-301.[2]

I read Rule 4-332 as implementing the legislative intent of § 8-301. The Rule adds some gloss to the statute by imposing a non-waivable pleading requirement akin to a condition precedent. Where the maintenance of a cause of action depends upon the performance of a condition precedent, the plaintiff "must allege performance of such condition or show legal justification for nonperformance," *Cannon v. McKen*, 296 Md. 27, 38, 459 A.2d 196, 202 (1983), because "the action is fatally flawed if the condition is not satisfied." *Rios v. Montgomery Cty.*, 386 Md. 104, 127, 872 A.2d 1, 14 (2005); *see also Hansen v. City of Laurel*, 420 Md. 670, 678, n.5, 25 A.3d 122, 127, n.5 (2011) (recognizing that failure to satisfy a jurisdictional condition precedent compels dismissal of the appeal); *State v. Parks*, 148 Md. 477, 129 A. 793 (1925) (upholding demurrer to complaint based on failure to plead satisfaction of condition precedent).

We have defined a condition precedent as a "condition attached to the right to sue at all," *Waddell v. Kirkpatrick*, 331 Md. 52, 59, 626 A.2d 353, 356 (1993) (quoting *The Harrisburg*, 119 U.S. 199, 214 (1886)), and have read conditions precedent into statutes where the statute "create[s] a new legal liability" that is intertwined with a limitations period.

---

[2]For example, the Fiscal and Policy Note for Senate Bill 486 notes that, both state-wide and locally, the fiscal effects "can be handled with existing budgeted resources." The Legislature would have had to expect greater fiscal effects (*e.g.*, increased repetitious filings) if it intended to open the courthouse door to anyone who successfully foraged for new evidence—potentially years after a trial—even if merely impeaching evidence.

*Hansen*, 420 Md. at 687, 25 A.3d at 133 (quoting *The Harrisburg*, 119 U.S. at 214). We have also held that government officers may not waive conditions precedent in sovereign immunity cases. *See State v. Sharafeldin*, 382 Md. 129, 141, 854 A.2d 1208, 1214 (2004); *see also Rios*, 386 Md. at 127, 872 A.2d at 14. Section 8-301 is not just a procedural statute; it is remedial as well. *See State v. Matthews*, 415 Md. 286, 297, 999 A.2d 1050, 1057 (2010). It creates a new legal right that heretofore did not exist—*i.e.* the right to move for a new trial after the one year time-bar in Rule 4-331(c) where the motion is premised on newly discovered, non-DNA evidence. I therefore read the Rule 4-332(d) requirement to plead actual innocence as a "hard" prerequisite—the imposition of which is necessary to a faithful application of § 8-301.

The legislative history indicates that the General Assembly enacted § 8-301 to provide a mechanism for relief to one very specific class of people—individuals who are factually innocent and who have been *wrongfully convicted*—and to circumscribe relief to that class of people. Section 8-301 recognizes that because "the development of new evidence sometimes takes more than a decade to materialize, when such evidence does become available *in a case of a wrongfully convicted defendant*, there should be an available mechanism for seeking judicial review, with the defense bearing the burden of proof." *Regarding Senate Bill 486 – Petition for Writ of Actual Evidence – Newly Discovered Evidence Before the S. Committee on Judicial Proceedings* (2009) (statement of Sen. Kelley) (emphasis added) (hereinafter "Judicial Proceedings Committee Hearing"). The codified

statute's title—"Petitions for writ of actual innocence"—is particularly notable, for we have long recognized that "[t]he title of an act is relevant to the ascertainment of its intent and purpose." *Mass Transit Admin. v. Baltimore Cty. Revenue Auth.*, 267 Md. 687, 695-96, 298 A.2d 413, 418 (1973); *see also Yonga v. State*, 221 Md. App. 45, 63, 108 A.3d 448, 459 (2015), *aff'd*, 446 Md. 183, 130 A.3d 486 (2016) ("The very title of § 8-301 as a 'Petition for writ of actual innocence' prominently proclaims its purpose.").

Before enactment of § 8-301, a trial court could order a new trial only in the following four situations: (1) where the motion for new trial was made within *ten days* after the verdict and the court found it was in the interests of justice to grant the motion; (2) where the motion for new trial, premised on newly discovered evidence, was made *within one year* of either sentencing or a mandate issued by the final appellate court to consider the case on direct review, and the evidence could not have been discovered by due diligence; (3) *at any time* where the motion for new trial was based on *DNA evidence*; or (4) in the case of a *death sentence*, *at any time*, where the motion for new trial was based on newly discovered evidence that showed the defendant *was innocent of* the capital crime or other condition of death penalty eligibility. *See* Floor Report for Senate Bill 486 (2009) (hereinafter "Floor Report"); Md. Rule 4-331(a)-(d). Section 8-301 thus sought to "provide recourse for a wrongfully convicted defendant in certain cases where none of" the situations described by Rule 4-331 were in play. Judicial Proceedings Committee Hearing (statement of Sen. Kelley). In *Douglas v. State*, 423 Md. 156, 176, 31 A.3d 250, 262 (2011), the Court

recognized that § 8-301 "reflects a legislative purpose that the statute extend the right to seek a new trial on the basis of newly discovered evidence beyond that afforded a convicted defendant under Maryland Rule 4-331(c)." The right that § 8-301 extends is the defendant's opportunity to "seek a new trial based on newly discovered evidence *that speaks to his or her actual innocence . . . .*" *Id.* (emphasis added). Therefore, the distinction between a motion for new trial under Rule 4-331(c)(1) and a petition for writ of actual innocence under § 8-301 "is in the substantive nature of the thing that the newly discovered evidence must show," *Yonga*, 221 Md. App. at 57, 108 A.3d at 455, *i.e.* "factual innocence, not mere legal insufficiency." *Id.* (quoting *Bousley v. United States*, 523 U.S. 614, 623 (1998)).[3]

---

[3]One could argue that "actual innocence," as codified in § 8-301, refers to the Supreme Court's *habeas corpus* jurisprudence in death penalty cases. Under *Bousley v. United States*, 523 U.S. 614, 623 (1998), to show actual innocence, "the petitioner must show that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence." *Schlup v. Delo*, 513 U.S. 298, 327 (1995). When Governor Martin O'Malley signed § 8-301 into law in 2010, Maryland still had the death penalty on the books. Governor O'Malley signed a bill repealing the death penalty in 2013. Thus, it might be tempting to read the Supreme Court's "actual innocence" jurisprudence into § 8-301—and thereby reason that a petition for writ of actual innocence supported by newly discovered evidence must only tend to show a retrospective impact on the jury's verdict—not that the defendant did not commit the crime. That temptation should be avoided. As the Court alluded to in *Sawyer v. Whitley*, 505 U.S. 333 (1992), innocence in a capital case is different than innocence in a noncapital case. In a capital case, the prosecution has to prove, beyond a reasonable doubt, all of the elements that constitute the capital offense, and typically, for example, the existence of certain aggravating factors. A defendant could thus be guilty of a capital offense yet 'innocent of the death penalty' if the prosecution fails to prove aggravating circumstances. *Sawyer*, 505 U.S. at 340-43. By contrast, a noncapital defendant is actually innocent of his or her crime "where the State has convicted the wrong person of the crime." *Id.* at 340.

Section 8-301 did not evolve within a vacuum, and its enactment is part of a broader scheme of removing time bars for claims of actual innocence. The genesis occurred in the 1980s, when the use of DNA evidence in forensic investigations became technologically possible. *Yonga*, 221 Md. App. at 58, 108 A.3d at 456. Judge Charles E. Moylan Jr., explained the importance of the growing use of DNA evidence as follows:

> "The growing recognition of its sure-fire identification potential, in cold cases long after the fact, hit a sensitive national nerve, especially with respect to death penalty cases.
>
> * * *
>
> The sensitive social problem was that the imposition of capital punishment was irrevocable. It posed for many in the wide-ranging national debate the anguished question, 'How can we be sure we have not executed an innocent person?' *The concern was not with executing someone who might have been procedurally not guilty.* Fifty years of the Warren Court Revolution provided all the reassurance we needed on that score. *The concern was with actual, factual innocence.*"

*Id.* (emphasis added).

In 2001, the General Assembly passed what is now Criminal Procedure Article § 8-201, providing for a defendant's right to seek DNA testing in certain circumstances. "Section 8-201 was enacted . . . in line with a nationwide trend to adopt postconviction DNA testing statutes designed to provide an avenue for the exoneration of the actually innocent." *Blake v. State*, 395 Md. 212-13, 219, 909 A.2d 1020, 1023 (2006). The Standing Committee on Rules of Practice and Procedure responded, in part, by proposing an amendment to Rule

-10-

4-331 permitting a "motion [to] be filed at any time if the evidence of a scientific process would show that the defendant is innocent of the crime." *Matthews*, 415 Md. at 310, 999 A.2d at 1064 (quoting the statement of the Committee Chairman, Judge Joseph F. Murphy, Jr.); *see also* Standing Committee on Rules of Practice and Procedure Minutes at 70 (Feb. 9, 2001) (proposed amendment to Rule 4-331 was an "exception" to the rule that a court may not order a new trial after the one-year deadline passed); *Yonga*, 221 Md. App. at 60, 108 A.3d at 457 ("Actual innocence was the *sine qua non* for the removal of the filing deadline.").

Section 8-301 is just another step forward in the direction of providing an avenue to exoneration. *State v. Seward*, 220 Md. App. 1, 15, 102 A.3d 798, 806 (2014) *rev'd on other grounds*, 446 Md. 171, 130 A.3d 478 (2016) ("[T]he legislative materials suggest that the actual innocence statute was conceived, by its proponents, as a means to extend the relief afforded under the DNA postconviction statute to those for whom DNA evidence was unavailable."). It therefore makes little sense to permit a petition that does not, as a threshold matter, allege that proffered newly discovered evidence proves actual innocence, to proceed, because § 8-301 is part of a larger scheme of removing time bars only for the wrongfully convicted. Simply because the Court is anxious to reach the merits of petitioner's claim is not a valid reason to ignore the pleading requirement of the Rule. Moreover, such an *ad hoc* approach to the Rule, requirement and purpose in enforcing the statute will lead to uneven and unfair application of the statute.

-11-

A different reading of the statute would put us in unexplored territory. Two of our neighbors with similar statutes—the District of Columbia and the Commonwealth of Virginia—both require petitioners for writs of actual innocence to plead their actual innocence as a statutory matter.[4] The Supreme Court of Virginia has recognized the centrality of actual innocence in obtaining relief under its writ of actual innocence statute. In *Carpitcher v. Commonwealth*, 641 S.E.2d 486, 492 (Va. 2007), the Court addressed whether the alleged recantation of a sexual abuse victim's testimony was material. The Court explained, after examining the text of the statute and relevant legislative history, that:

> "[b]y enacting these provisions, the General Assembly intended to provide relief only to those individuals who can establish that they did not, as a matter of fact, commit the crimes for which they were convicted. The statutes governing writs of actual innocence based on non-biological evidence considered as a whole, and Code § 19.2-327.11 in particular, were not intended to provide relief to individuals who merely produce evidence contrary to the evidence presented at their criminal trial."

*Carpitcher*, 641 S.E.2d at 492. The Court then held that recantation evidence is not material unless it is true, because a different "construction of the statute would defeat the legislative

---

[4]Virginia was among the first state legislatures to enact writ of actual innocence provisions. In 2001, the Legislature enacted a writ of actual innocence provision for newly discovered biological evidence; in 2004, it enacted a provision for newly discovered non-biological evidence. *See* 2001 Va. Acts Ch. 873 (codified at Va. Code Ann. §§ 19.2-327.2-6); 2004 Va. Acts Ch. 1024 (codified at Va. Code Ann. §§ 19.2-327.10-14). The District of Columbia's writ of actual innocence statute—the Innocence Protection Act (IPA)—requires a petitioner to establish how newly discovered evidence "demonstrates that the movant is actually innocent despite having been convicted at trial or having pled guilty." Under the IPA, actual innocence "means that the person did not commit the crime of which he or she was convicted." D.C. Code §§ 22-4131, 4135.

intent of restricting relief only to those individuals who can establish that they did not commit the crime for which they have been convicted." *Id.* The Court's holding in *Carpitcher* is persuasive because Maryland's writ of actual innocence statute was apparently modeled after Virginia's statute, although § 8-301 contains some minor textual differences. *See* Floor Report (highlighting Virginia's "similar legislation").[5] Moreover, I agree with the Supreme Court of Virginia that the purpose of the writ of actual innocence legislation is to restrict relief to those who can establish their factual innocence.

Perjury is an affront to justice in whatever form it takes. Nonetheless, in my view, the Legislature enacted § 8-301 to provide a means of exoneration in a narrow class of cases only. After examining § 8-301's purpose, history, and position within the broader statutory scheme, I conclude that, for relief, pleading actual innocence is a non-waivable requirement. The petitioner never made this threshold assertion; therefore, his petition should be dismissed.

---

[5]For example, a petitioner for a writ of actual innocence must allege "that the petitioner is actually innocent of the crime for which he was convicted" under the Virginia writ of actual innocence statute. Va. Code Ann. §§ 19.2-327.11. In Maryland, a similar requirement is prescribed instead by Rule 4-332.